# Exhibit 3

**REPORTERS COMMITTEE**
**FOR FREEDOM OF THE PRESS**

PO Box 34176
Washington, DC 20043
(202) 795-9300 • www.rcfp.org

**PRESIDENT**
Bruce D. Brown

**STEERING COMMITTEE CHAIR**
STEPHEN J. ADLER

**VICE CHAIR**
MARGARET LOW
WBUR

**SECRETARY-TREASURER**
MASSIMO CALABRESI
The New York Times

**EXECUTIVE COMMITTEE**
**MEMBERS**
DAVID BOARDMAN
Temple University
THEODORE J. BOUTROUS, JR.
Gibson, Dunn & Crutcher LLP
GAIL GOVE
NBCUniversal
LAURA HANDMAN
Davis Wright Tremaine
DIEGO IBARGÜEN
Hearst
THOMAS C. RUBIN
OpenAI

**STEERING COMMITTEE MEMBERS**
MARTY BARON
Ret., The Washington Post
WOLF BLITZER
CNN
SEWELL CHAN
USC Annenberg
LYNETTE CLEMETSON
University of Michigan
JASON CONTI
Dow Jones
NIKHIL DEOGUN
Brunswick Group
MANNY GARCIA
Florida International University
EMILIO GARCIA-RUIZ
The San Francisco Chronicle
JOSH GERSTEIN
POLITICO
ALEX GIBNEY
Jigsaw Productions
JAMES GRIMALDI
National Catholic Reporter
KAREN KAISER
The Associated Press
KIMBRIELL KELLY
Chicago Public Media
ALEX MACCALLUM
CNN
MATT MURRAY
The Washington Post
NORMAN PEARLSTINE
New York, New York
CHARLIE SAVAGE
The New York Times
ADAM SYMSON
The E.W. Scripps Company
MATT THOMPSON
The New York Times
VICKIE WALTON-JAMES
NPR

*Affiliations appear only for purposes of identification.*

United States Department of Justice
Executive Office for United States Attorneys
Washington, D.C.

March 2, 2026

VIA FOIA.GOV

To Whom It May Concern:

This letter constitutes a request under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), and is submitted on behalf of the Reporters Committee for Freedom of the Press ("RCFP" or the "Reporters Committee") to the United States Attorney's Office for the Eastern District of Virginia via the Executive Office for United States Attorneys ("EOUSA").

The Reporters Committee is an unincorporated nonprofit association of reporters and editors dedicated to defending the First Amendment and newsgathering rights of the news media.

I.    Definitions

Please note that as used herein:

- "EMAIL(S)" means and refers to electronic mail that was sent, received, copied on, or blind copied on, any attachments thereto, as well as the entirety of any email chain the email(s) are part of, whether such emails were sent or received sent on government systems or non-governmental systems;

- "ELECTRONIC MESSAGE(S)" means and refers to any electronic message other than emails, and includes (but is not limited to) information sent via SMS, iMessage, Signal, WhatsApp, Wickr, Confide, X, Truth Social, and any iOS or Android applications;

- The "MEMORANDUM OPINION" means and refers to the Memorandum Opinion and Order, *In the Matter of the Search of the Real Property and Premises of Hannah Natanson*, No. 1:26-SW-00054 (WBP), 2026 WL 510727 (E.D. Va. Feb. 24, 2026). A

true and correct copy of that memorandum opinion and order is attached hereto as Exhibit A;

• The TRANSCRIPT means and refers to the transcript of proceedings on February 20th, 2026, in *In the Matter of the Search of the Real Property and Premises of Hannah Natanson*, 26-sw-00054 (EDVA Feb. 24, 2026). A true and correct copy of that transcript is attached hereto as Exhibit B; and

• KROMBERG means and refers to Assistant United States Attorney Gordon D. Kromberg.

II.    Requested Records

Pursuant to FOIA, I, on behalf of RCFP, request access to and copies of the following:

1.  The search warrant application and affidavit submitted to the United States District Court for the Eastern District of Virginia on the evening of January 12, 2026, "seeking information the government believed Ms. Natanson possesses[,]" as referenced on page 4 of the MEMORANDUM OPINION;

2.  All records constituting or reflecting Magistrate Judge William Porter's rejection of the search warrant submitted on January 12, 2026, along with any records consisting of or documenting Judge Porter's "concerns," as referenced on page 4 of the MEMORANDUM OPINION;

3.  The "proposed search warrant" submitted to the United States District Court Eastern District of Virginia "late in the afternoon of January 13, 2026," as referenced on page 4 of the MEMORANDUM OPINION;

4.  The "successive versions of the proposed warrant" presented to the United States District Court for the Eastern District of Virginia thereafter on January 13, 2026, as referenced on page 4 of the MEMORANDUM OPINION;

2

5. All records memorializing or reflecting the substance of the telephone calls involving Magistrate Judge William Porter and KROMBERG, as referenced on pages 4 and 9–10 of the MEMORANDUM OPINION.

6. The "multiple memos from the Department of Justice discussing the PPA," as referenced by KROMBERG in the TRANSCRIPT at 39:25–40:1;

7. The "memos" referenced by KROMBERG in the TRANSCRIPT at 41:9–12;

8. All EMAILS sent to or from KROMBERG between January 7 and January 15, 2026, that mention or refer to Hannah Natanson;

9. All EMAILS sent between KROMBERG and WBP_Chambers@vaed.uscourts.gov on January 13 and 14, 2026; and

10. All ELECTRONIC MESSAGES sent to or from Kromberg on January 13 and 14, 2026.

Please provide all responsive records in electronic format via email to amarshall@rcfp.org

III. <u>Fees</u>

As a representative of the news media, the Reporters Committee is only required to pay for the direct cost of duplication after the first 100 pages. 5 U.S.C. § 552(a)(4)(A). These records are being sought on behalf of the Reporters Committee for analysis and free dissemination to the general public through multiple avenues, including RCFP's website,[1] social media accounts,[2] and email newsletters.[3] In the event there are fees for responding to this request, RCFP is willing to pay up to $25.00. Please inform me if the fees will exceed that amount before proceeding.

---

[1] https://www.rcfp.org/.

[2] https://bsky.app/profile/rcfp.org (8.4k followers as of Jan 30, 2026); https://www.facebook.com/ReportersCommittee (10k followers as of Jan 30, 2026); https://x.com/rcfp (24.9k followers as of Jan 30, 2026).

[3] https://www.rcfp.org/subscribe/.

IV. Conclusion

If this request is denied in whole or in part, please justify all such denials by reference to specific exemptions and provide an explanation of why EOUSA "reasonably foresees that disclosure would harm an interest" protected by that exemption or why "disclosure is prohibited by law[.]"  5 U.S.C. §552(a)(8).  Please also ensure all segregable portions of otherwise exempt material are released.

If you have any questions regarding this request, please do not hesitate to contact me via email at amarshall@rcfp.org.

I look forward to your determination within 20 working days, as is required by FOIA.  Thank you in advance for your assistance in this matter.

Sincerely,

Adam A. Marshall
Reporters Committee for
Freedom of the Press
amarshall@rcfp.org

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF | ) | |
| THE REAL PROPERTY AND PREMISES | ) | Case No. 1:26-sw-00054 (WBP) |
| OF HANNAH NATANSON | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Movants Hannah Natanson and the WP Company's (collectively, "Movants" or "the

Washington Post") have moved to intervene in this search warrant matter and for return of

property under Federal Rule of Criminal Procedure 41(g). For the reasons below, the Court

GRANTS the Motion to Intervene and GRANTS in part and DENIES in part the Motion for

Return of Property.

**I.**

A.

Hannah Natanson is a reporter for the Washington Post and the self-proclaimed "federal

government whisperer." Hannah Natanson, *I Am The Post's 'Federal Government Whisperer.'*

*It's Been Brutal.*, WASH. POST (Dec. 25, 2025) A03, https://perma.cc/UQJ5-9493. According to a

first-person article she published on December 25, 2025, shortly after the presidential

inauguration in January 2025 and following the early days of the Department of Government

Efficiency ("DOGE"), she shared her contact information on the Reddit[1] subreddit[2] "r/fednews,"

a forum she describes as one "where some 300,000 federal employees were posting every few

---

[1] Reddit is a social news aggregation, web content rating, and discussion platform that "aspires to be the heart of the internet" and "gives people tools to build community, creating space for genuine discussion." *Reddit Brand*, https://perma.cc/52UJ-PRP9 (last visited Feb. 23, 2026).

[2] A subreddit is a web forum within Reddit focusing on specific hobbies, topics, or interests. Anyone can make a subreddit on any topic and users can subscribe and unsubscribe at will. *See r/help*, REDDIT, https://perma.cc/XPN7-2FJS (last visited Feb. 23, 2026).

seconds to commiserate about their fates under a president determined to downsize the bureaucracy." *Id.* Ms. Natanson posted on r/fednews that she wanted to "speak with anyone willing to chat," and listed her Signal[3] contact information. *Id.* Over the next 11 months, Ms. Natanson developed almost 1,200 confidential sources drawn from federal employees at more than 120 agencies who, in her words, requested anonymity because they "fear retribution from the government due to their disclosures." (ECF No. 9-1 ¶¶ 5–6, 39.) On average, she received between dozens and more than 100 tips per day from these sources. (*Id.* ¶¶ 7, 39.) These tips led her to write or co-write "more than 200 articles across roughly twenty news desks." (*Id.*)

Most sources communicated through Signal, which she accessed on her phone and computer, and she worked to protect their identities. (*Id.* ¶¶ 9–10.)

B.

Since early 2025, the administration has attempted to identify federal employees who disclose government information to the press. That campaign has spanned multiple departments, employed tools ranging from internal investigations to polygraph examinations, and culminated in formal changes to federal regulations governing the press.

The scope of the administration's efforts has extended beyond classified or sensitive national security information. *See* Marisa Taylor *et al.*, *Trump Officials Are Using Polygraph Tests to Flush Out Even Minor Leaks*, REUTERS (May 23, 2025, at 03:33 EDT), https://perma.cc/VF79-QXBC. For example, when reports that the Office of Personnel

---

[3] Signal is a fee, open source, and privacy-focused messaging app that enables secure text, voice, and video communication. It uses end-to-end encryption to ensure that only the sender and recipient can read messages or hear calls, making it highly secure against third-party interception. *See* Kelvin Chan, *Here's What to Know about Signal, the Messaging App Used in Apparent Leak of War Plans to a Journalist*, ASSOCIATED PRESS (Mar. 25, 2025, at 11:09 EST), https://perma.cc/YQ49-AP5W.

Management ("OPM") was considering hiring a driver for agency directors hit the news, OPM officials immediately launched an investigation to identify the source. *Id.* Current and former federal employees told Reuters that the administration has conducted "a concerted effort to expose leaks of all kinds," and that the investigations pursue two goals: stopping unauthorized disclosures and purging employees perceived as disloyal to the administration's agenda. *Id.* The Department of Defense, the Department of Homeland Security, and the Department of Justice ("DOJ") have pursued their own investigations and have administered polygraph examinations to employees to identify leakers. *Id.*

At the DOJ, the administration formalized its approach to leak investigations in April 2025. Attorney General Pam Bondi rescinded a Biden-era regulation broadly prohibiting compulsory process against journalists in leak investigations and replaced it with regulations, effective May 1, 2025, that expressly permit the DOJ to use search warrants for leaks of both classified and unclassified information. *See* Pam Bondi Memo, *Updated Policy Regarding Obtaining Information From, or Records of, Members of the News Media* (Apr. 25, 2025), https://perma.cc/S4K7-GW9B, *reported in* Ryan Lucas, *Justice Department Revokes Biden-Era Protections for Reporters in Leak Investigations*, NPR (Apr. 25, 2025, at 8:26 ET), https://perma.cc/UZ8M-V37V. In her memo, Attorney General Bondi cited the leak of intelligence assessments about the Venezuelan gang Tren de Aragua and the leak concerning the placement of a high-ranking DOD official on leave as examples warranting the policy change. *Id.* at nn.6–7.

C.

On January 8, 2026, the government arrested Aurelio Luis Perez-Lugones on a criminal complaint issued out of the District of Maryland, charging him with unlawfully retaining national

3

defense information in violation of 18 U.S.C. § 793(c). *See United States v. Perez-Lugones*, No. 1:26-cr-00030-MJM (D. Md. 2026).

As part of its investigation of Mr. Perez-Lugones, on the evening of January 12, 2026, an assistant United States attorney ("AUSA") for the Eastern District of Virginia applied on an expedited basis for a search warrant seeking information the government believed Ms. Natanson possessed. The AUSA filed the application in this Court because Ms. Natanson lives in the Eastern District of Virginia. The affidavit in support of the search warrant cited Ms. Natanson's first-person article. Upon review of the article, the Court became concerned about both the scope of the proposed search warrant and the government's apparent attempt to collect information about Ms. Natanson's confidential sources. That evening, the Court rejected the government's proposed search warrant and explained its concerns to the AUSA and the Principal Deputy Assistant Attorney General of the National Security Division.

Late in the afternoon of January 13, 2026, the AUSA submitted another proposed search warrant, which the Court also rejected. Over the next five hours, the Court held multiple in-person and telephone conferences with the AUSA, who presented successive versions of the proposed warrant, until the Court ultimately approved a search warrant "limited to all records and information, including classified and/or national defense information, from the time period October 1, 2025, to the present, which constitute records received from or relating to Aurelio Luis Perez-Lugones, as evidence of violations of 18 U.S.C. § 793." (ECF No. 4 at 4.) The Court signed the warrant just before 10:00 p.m. after an FBI special agent swore to the truth of the supporting affidavit. (*Id.* at 1.)

The Court's probable cause finding rested principally on three allegations: (i) on multiple occasions, Mr. Perez-Lugones had provided Ms. Natanson with top secret and other classified

4

information that appeared in her published articles days later; (ii) they had exchanged this classified information using Signal; and (iii) they had set their messages to auto-delete after one day. (ECF No. 39 ¶¶ 5–6, 8–11, 13, 15.)

At 6:05 a.m. the next morning, January 14, 2026, the FBI executed the search warrant at Ms. Natanson's home. (ECF No. 5.) The government seized two laptops, one mobile phone, a portable drive, a recording device, and an exercise watch. (*Id.*) At or around the same time, the government issued a grand jury subpoena to the Washington Post requesting substantially the same information it sought with the search warrant served on Ms. Natanson. (ECF No. 9-8.)

In a declaration, Ms. Natanson states that, since the government seized her devices, her sources have gone silent, and she has been unable to gather information or publish stories. (ECF No. 9-1 ¶¶ 39, 41–43.) She states that she needs her devices to do her job and to help her colleagues do theirs. (ECF No. 9-1 ¶¶ 40–41.)

D.

The same day the FBI executed the search warrant, counsel for the Washington Post contacted the government, advised that the seized items contained materials protected by the First Amendment and the attorney-client privilege, and asked that the government refrain from reviewing any of the material. (ECF No. 9-4 at 2.) Over the next six days, counsel for the Washington Post conferred multiple times with the government and proposed multiple frameworks that would involve the government preserving the seized data but not reviewing it until the parties could agree on a process to protect Ms. Natanson's and the Washington Post's First Amendment rights and the attorney-client privilege. (*Id.* at 2–3.) The parties reached no agreement because government counsel stated that all decisions required approval from more senior officials. (*Id.*) Eventually, the government agreed not to begin a substantive review of the

5

seized material until counsel could confer on January 20, 2026. (*Id.* at 2.) During that discussion, counsel for the Washington Post reiterated its concerns about the First Amendment and the attorney-client privilege. (*Id*. at 3.) To resolve those issues, the Washington Post proposed that the government return the seized property and allow it to produce information in response to the grand jury subpoena. (*Id.* at 3.) The government rejected this proposal. (*Id.*)

Counsel for the Washington Post informed the government that it intended to seek judicial relief within 24 hours. Relying on the Fourth Circuit's decision *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159 (4th Cir. 2019) ("*Baltimore Law Firm*"), counsel asked the government not to review the seized material and to preserve the status quo until a court could address its arguments. (*Id.*) The government refused and declined to take any position on a protocol to protect either the attorney-client or the First Amendment privileges. (*Id.* at 3–4.)

On January 21, 2026, Movants moved to intervene and for return of property (ECF No. 8) and for a standstill order while the parties briefed the issues (ECF No. 10). That same day, the Court granted Movants' Motion for a Standstill Order and ordered the government to preserve but not review any of the seized materials. (ECF No. 18.) The government is complying with this order. (ECF No. 35 at 7.)

The parties briefed the motions and argued them on February 20, 2026. (ECF No. 55.) During oral argument, the Court asked the government whether it would agree to foreswear reliance on the plain-view doctrine if the Court permitted it to review the seized materials. (Feb. 20, 2026, Tr. at 32–33.) The government refused. (*Id.*)

## II.

This case sits at the intersection of the government's compelling interest in prosecuting the unlawful disclosure of classified national security information and a working journalist's

First Amendment rights. These are not easy issues. In the 1971 case involving the Pentagon Papers, the Supreme Court decided the foundational modern case on First Amendment prior restraint in the national security context, *New York Times Co. v. United States*, 403 U.S. 713 (1971). In a terse *per curiam* opinion, the Supreme Court held that the government "carries a heavy burden of showing justification for the imposition of such a restraint" and determined that the government had not met that burden. *Id.* at 714. But each Justice wrote separately. Nine Justices, nine separate opinions. Hardly doctrinal completeness.

But this is not purely a prior restraint case, and the Pentagon Papers case does not address criminal prosecution under the Espionage Act. The government has an ongoing criminal investigation and has established probable cause to believe Movants possess evidence needed to prosecute it.

The question presented is twofold. First, if the government believes a reporter possesses classified national security evidence provided by a third party charged with violating the Espionage Act, and at least some of that evidence could be destroyed automatically by modern messaging applications, may the government seize that information to prevent its destruction, even if doing so restrains the reporter's work? Second, if so, and if that classified evidence is stored among thousands of unrelated electronic files subject to the reporter's First Amendment rights and the attorney-client privilege, who should locate and extract it?

A.

Movants argue that *all* the devices seized and *all* the data contained in them must be returned. In Movants' view, the seizure constitutes an unconstitutional prior restraint because seizing a broad swath of information unrelated to the search warrant substantially impairs or prevents their current and future ability to publish the news, including their ability to

7

communicate with sources. (*See* ECF No. 9 at 16.) Movants argue that the government's interest can be protected by quashing the search warrant, returning the devices and data to them, and allowing them to respond to the subpoena issued to the Washington Post. (*Id.*)

Alternatively, Movants argue that the government has no legitimate interest in the vast quantity of non-responsive material on the devices and that, at best, the government has a legitimate interest only in a narrow set of material relating to Mr. Perez-Lugones. (*See id.* at 21–23.) Allowing the government to search through their devices without limitation, Movants contend, would amount to an unlawful general warrant. (*Id.* at 22.) They ask the Court to order the government to return the non-responsive data and to oversee the review process. (*Id.* at 21.)

B.

For its part, the government argues that the Court should allow it to retain all of Movants' property because it needs certain evidence on the devices to prosecute Mr. Perez-Lugones. (ECF No. 35 at 8.) The government also argues that no "journalist exception" applies to search warrants and that Movants' devices contain government secrets of the most sensitive type, the disclosure of which risks exceptional harm to the United States. (*See id.* at 18.)

The government dismisses Movants' First Amendment argument on the ground that no prior restraint exists here because no law or court order blocks Movants' speech "in advance of its actual expression" and that nothing prevents Movants from contacting sources or publishing stories. (*Id.* at 22–23.)

The government argues that it has developed an appropriate filter team protocol, including experts trained in identifying national security information, and that it alone should be permitted to search all of Movants' data. (*Id.* at 26–29.)

8

**III.**

A.

Before reaching the merits, the Court addresses a matter of significant concern: the government's failure to identify and analyze the Privacy Protection Act of 1980, 42 U.S.C. §§ 2000aa *et seq.* ("PPA"), in its search warrant application. As the judge who found probable cause and approved the search warrant, the Court acknowledges that it did not independently identify the PPA when reviewing the warrant application. As far as this Court knows, courts have approved search warrants directed at members of the press in only a handful of instances. This Court had never received such an application and, at the time it approved the warrant, was unaware of the PPA. This Court's review was limited to probable cause, and the Court accepts that gap in its own analysis. But the government's failure to identify the PPA as applicable to a request for a search warrant on a member of the press—and to analyze it in its warrant application—is another matter. This omission has seriously undermined the Court's confidence in the government's disclosures in this proceeding.

The PPA is directed at government lawyers, and its terms require the Attorney General to issue regulations outlining the procedures the government must employ when seeking information from the press. *See* 42 U.S.C. §2000aa-11. These DOJ regulations, found in 28 C.F.R. Part 50, confirm that subpoenas and search warrants targeting the press are "extraordinary measures, not standard investigatory practices." 28 C.F.R. § 50.10(a)(3). Recognizing the extraordinary nature of these devices, the regulations require approval at all levels up to the Attorney General when the government seeks a search warrant targeting the press. So does DOJ's Justice Manual, which is issued to every AUSA throughout the country. *See* U.S. Dep't of Just., Just. Manual § 9-13.400. The Court's communications with the government over two days

9

were not limited to the local AUSA. Counsel from the highest levels of the DOJ participated in at least one of those calls. Many government lawyers had multiple opportunities to identify the PPA as controlling authority and to include an analysis of it in the warrant application. None of them did.

Among other responsibilities, magistrate judges serve as probable cause gatekeepers for search warrants. We communicate with government attorneys multiple times a day during our criminal duty weeks, assessing probable cause for search warrant applications. These requests come in a fast-paced environment. The search warrant the Court approved in this case was one of 46 the government requested that week.

In its day-to-day workings, this Court affords government attorneys a presumption of regularity, including by assuming that federal prosecutors have satisfied their obligation to disclose controlling and relevant authority. The Court extends this latitude to prosecutors because:

> [T]hey are designated by statute as the President's delegates to help him discharge his constitutional responsibility to "take Care that the Laws be faithfully executed." As a result, the presumption of regularity supports their prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.

*United States v. Venable*, 769 F. Supp. 2d 976, 984–85 (E.D. Va. 2011) (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996) and U.S. CONST., art. II, § 3)), *aff'd*, 666 F.3d 893 (4th Cir. 2012).

The government's conduct has disturbed that baseline posture of deference.

### B.

The PPA is far from a model of clarity. Congress enacted it in response to *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978), and it contains prohibitions, exceptions, and counter-

exceptions. Within the same statute, the PPA defines the press differently depending on whether work product materials or documentary materials are at issue. *Compare* 42 U.S.C. § 2000aa(a) ("*a person reasonably believed to have* a purpose to disseminate to the public a newspaper" (emphasis added)) *with id*. § 2000aa(b) ("*a person in connection with* a purpose to disseminate to the public a newspaper" (emphasis added)). The subsection addressing documentary materials also contains the stray clause "other than work product materials," *id*., which read literally, might seem to give the government broader access to work product—a reading that is presumably mistaken. In short, the statute's structure is complex and its drafting leaves interpretive questions unresolved.

At its core, however, the PPA prohibits any government officer from searching for or seizing "work product materials" or "documentary materials" possessed by a person "reasonably believed to have a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication." 42 U.S.C. § 2000aa(a)–(b). The PPA's coverage extends to anyone engaged in First Amendment-protected communication activities, not just professional journalists. *Id.*

The PPA creates two categories of protected materials. "Work product materials," defined in § 2000aa-7(b), include materials created, prepared, or possessed for the purpose of communicating to the public, such as notes, drafts, photographs, and recorded impressions. These receive the PPA's strongest protection. "Documentary materials," defined in § 2000aa-7(a), encompass all other materials possessed in connection with a public communication purpose and receive somewhat lesser, though still significant, protection.

The PPA embeds a structural preference for subpoenas over search warrants. *See* 42 U.S.C. §§ 2000aa-11, 2000aa-12 (requiring "the least intrusive method or means of obtaining

11

such materials"). A subpoena provides the recipient advance notice and the opportunity to challenge or negotiate production before any materials are seized. A search warrant is unannounced, coercive, and disruptive, potentially exposing confidential sources and chilling newsgathering even where the search yields nothing relevant.

Exceptions permitting a search warrant over a subpoena are narrow. For work product materials, a warrant is permissible only if: (1) there is probable cause to believe the person possessing the materials has committed or is committing the criminal offense to which the materials relate (*i.e.*, the "suspect exception," when the press entity is itself the suspect rather than a third-party holder of evidence); or (2) immediate seizure is necessary to prevent death or serious bodily injury. *Id.* § 2000aa(a)(1)–(2). Notably, the destruction-of-evidence exception does not apply to work product materials—a deliberate congressional choice reflecting the heightened protection work product commands. For documentary materials, the exceptions are somewhat broader and permit a warrant when the materials relate to the destruction of documents. *Id.* § 2000aa(b)(3).

## C.

While the government did not identify or discuss the PPA in its search warrant application, the Court cannot definitively conclude that it would not have authorized a warrant regardless. The Court bases this after-the-fact assessment on the following factors. First, the search warrant application did not state that Ms. Natanson was *not* a target of the criminal investigation—although the Court acknowledges the unresolved legal question of whether the Espionage Act can be applied to a journalist who receives and publishes classified information. The government expressly alleged that Ms. Natanson received classified information from Mr. Perez-Lugones, and its intent towards her was unclear. The Court learned that Ms. Natanson was

12

not a focus of the investigation only through press reports published the day the warrant was executed.[4] *See, e.g.*, Benjamin Savage et al., *F.B.I. Searches Home of Washington Post Journalist in a Leak Investigation*, N.Y. TIMES (Jan. 14, 2026), https://perma.cc/G93W-XSFS. Second, the Court was persuaded by the allegations in the supporting affidavit that classified national security information had been unlawfully exchanged and that—because the parties had communicated using disappearing messages—evidence could be destroyed. Those facts bear on applicable PPA exceptions, particularly the national security exception for documentary materials. 42 U.S.C. § 2000aa(b)(1)(A).

Even so, had the government disclosed the PPA, the Court may well have rejected the search warrant application and directed the government to proceed by subpoena instead. At the very least, it would have asked more questions.

The government deprived the Court of the opportunity to make those real-time decisions.

---

[4] Clouding the issue, at the February 20, 2026, hearing, the AUSA who submitted the search warrant stated that he did not identify the PPA in the application because he believed the "suspect exception applied," and that he had been "advised between 2013 and 2020 that the PPA did not apply when there was a reason to believe that the individual who maintained the information was involved in the offense." (Feb. 20, 2026, Tr. at 39-41.) The Court finds this explanation inadequate and only highlights why the AUSA should have analyzed the PPA in the application. The government cannot pretextually label a reporter a suspect simply to gather evidence against the actual target. DOJ's governing guidelines between 2013 and 2020 prohibited invoking the suspect exception "if the sole purpose is to further the investigation of a person other than the member of the news media." *See* 28 C.F.R. § 50.10(d)(5) (2016), https://perma.cc/S52Q-BKGD. Such a rule would mean that any invocation of the Espionage Act's receipt provision, *see* 18 U.S.C. § 793(c), would automatically strip a reporter of PPA protection—an interpretation that would render the statute a nullity and cannot be reconciled with Congress's purpose in enacting it. That the AUSA claims to have received contrary advice during the very period when DOJ policy reflected this limitation only underscores the inadequacy of the government's analysis here.

## IV.

The Court grants the Motion to Intervene. Federal Rule 41(g) provides that "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return." FED. R. CRIM. P. 41(g). In the Fourth Circuit, courts have recognized that Rule 41(g) motions provide an appropriate vehicle for challenging government seizures of property, even when a criminal prosecution is pending. *See Baltimore Law Firm*, 942 F.3d 159 (4th Cir. 2019).

Movants timely moved to intervene and have a direct interest in the seized property. The government obtained the property pursuant to a search warrant, making this an appropriate vehicle for a Rule 41(g) challenge. Permitting Movants to intervene also satisfies the Fourth Circuit's guidance in *Baltimore Law Firm* that—in circumstances involving search warrants seeking protected information—the Court should conduct adversarial rather than *ex parte* proceedings. 942 F.3d at 175–76.

## V.

Having allowed them to intervene, the Court turns to Movants' request for return of property. Rule 41(g) does not set forth a standard "to govern the determination of whether property should be returned," but the test is one of "reasonableness under all the circumstances." FED. R. CRIM. P. 41 advisory committee's note to 1989 amendment.

Movants argue that the return of their devices is reasonable because the seizure was an unconstitutional prior restraint, or because the government has no legitimate interest in non-responsive material. Movants propose that they or the Court should conduct any review to preserve their First Amendment and attorney-client privileges.

14

The government argues that no prior restraint has occurred here because the government has not prevented Movants from engaging in any expressive activities in the future. According to the government, "If [Ms. Natanson] wishes to publish a story tomorrow, nothing stops her from doing so." (ECF No. 35 at 16.) The government also argues that it must retain the devices because they contain information that may be used in the prosecution of Mr. Perez-Lugones. It asserts that, "[d]uring the pendency of an ongoing criminal investigation or proceeding, the [movant] bears the burden of demonstrating that the government's retention of the seized property is unreasonable." (*Id.* at 15 (citing *Allen v. Grist Mill Cap. LLC*, 88 F.4th 383, 396 (2d Cir. 2023).) The government proposes that its filter team, with an appropriate protocol, should be permitted to search all of Movants' data because it has a legitimate reason for doing so.

## A.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. CONST. amend. I. Prior restraints on speech carry a "heavy presumption against [their] constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). A prior restraint is "the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

The Court rejects the government's argument that its seizure of Ms. Natanson's devices does not implicate the First Amendment simply because no law or court order blocks her speech before its actual expression. In *Zurcher v. Stanford Daily*, the Supreme Court held that the First and Fourth Amendments do not categorically bar search warrants directed at newsrooms. 436 U.S. at 567. But the government reads *Zurcher* too narrowly.

At issue was the validity of a *per se* rule requiring subpoenas rather than warrants whenever press entities hold evidence the government seeks, a rule the Supreme Court declined

15

to adopt. *Id.* at 565–66. The Supreme Court held, "[w]here the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude,'" and "a seizure reasonable as to one type of material in one setting may be unreasonable in a different setting or with respect to another kind of material." *Id.* at 564 (quoting *Stanford v. Texas*, 379 U.S. 476, 485 (1965) and *Roaden v. Kentucky*, 413 U.S. 496, 501 (1973)).

This holding applies with even greater force in today's technological landscape.

*Zurcher* involved a search—not a seizure—of a newspaper office for a handful of photographs. 436 U.S. at 551. The Supreme Court found no prior restraint in those circumstances precisely because the newspaper retained its materials and its ability to publish. The government has seized the entirety of Ms. Natanson's work product: her active stories, her notes on future investigations, and her background and confidential source material that, once compromised, cannot be replaced. (*See* ECF No. 9 at 5.) The government's suggestion that she can simply start from scratch fails to recognize the realities of modern journalism and the value of confidential source relationships cultivated over time.

The Court finds that seizing the totality of a reporter's electronic work product, including tools essential to ongoing newsgathering, constitutes a restraint on the exercise of First Amendment rights. The current "setting" of this case is meaningfully different from *Zurcher*; the Court therefore applies "scrupulous exactitude" in evaluating the competing interests. *Zurcher*, 436 U.S. at 564.

## B.

While Movants' First Amendment rights have been restrained, the inquiry does not end there because the Supreme Court has never recognized absolute press immunity from legal

16

constraints. *See, e.g.*, *New York Times Co.*, 403 U.S. at 726 (Brennan, J., concurring) (military/national security exception); *Haig v. Agee*, 453 U.S. 280, 308–09 (1981) (private citizen's disclosure of intelligence operations and names of intelligence personnel) (quoting *Near v. Minn. ex rel. Olson*, 283 U.S. 697, 716 (1931) ("[n]o one would question but that a government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops.")).

The Court must therefore determine whether some restraint is reasonable given the government's compelling interest in collecting evidence of the alleged unlawful disclosure of classified information and in preventing further disclosure of such information.

The government cites several cases in its brief supporting the position that the government may retain property if it has a legitimate reason. *See, e.g.*, *Lavin v. United States*, 299 F.3d 123, 127–28 (2d Cir. 2002). The government's legitimate reason here is twofold. First, the government argues that it needs to obtain evidence for the prosecution of Mr. Perez-Lugones. *See Ramsden v. United States*, 2 F.3d 322, 326 (9th Cir. 1993); *United States v. Pierre*, 484 F.3d 75, 78 (1st Cir. 2007) ("[A] Rule 41(g) motion is properly denied if . . . the government's need for the property as evidence continues." (internal quotations omitted)); *United States v. Garcon*, 406 F. App'x 366, 370 (11th Cir. 2010). The Rule 41 advisory notes confirm that such a purpose is generally reasonable. *See* FED. R. CRIM. P. 41 advisory committee's note to 1989 amendment ("If the United States has a need for the property in an investigation or prosecution, its retention of the property generally is reasonable.") Second, the government argues that Movants' devices may contain classified information that cannot be returned. This reason, also, is reasonable, as discussed below.

17

Movants recognize the government's legitimate interest in retaining responsive information but argue that retaining all seized data is unreasonable because the government has no legitimate interest in non-responsive materials—newsgathering and attorney-client privileged material unrelated to the Perez-Lugones prosecution. (ECF No. 41 at 11.)

Balancing Movants' First Amendment rights and newsgathering rights against the government's compelling interest in its prosecution, the Court finds it reasonable for the government to retain only the limited information responsive to the search warrant—and nothing more.

How to find that limited information and return the rest to Movants is the harder question.

## C.

The most complicating factor is the possibility that classified national security information may be among the seized material. That possibility distinguishes this case from all the prior-restraint precedents on which Movants rely because "no governmental interest is more compelling than the security of the Nation." *United States v. Sterling*, 724 F.3d 482, 509 (4th Cir. 2013) (quoting *Haig v. Agee*, 453 U.S. 280, 307 (1981)). "This interest extends to 'protecting both the secrecy of information to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service.'" *Id.* (quoting *United States v. Abu Ali*, 528 F.3d 210, 247 (4th Cir. 2008)).

The Court therefore cannot simply order the government to return all devices and permit Movants to unilaterally identify material responsive to the search warrant. An appropriate search process must account for the need to identify and protect classified information before any materials are returned.

But that does not mean that in all cases the government gets to conduct that search.

D.

*Baltimore Law Firm* is the foundational circuit authority on government filter teams and the most significant appellate opinion on the topic nationally. In that case, the Fourth Circuit held that a magistrate judge erred by approving a filter team protocol in *ex parte* proceedings, without affording the privilege holder an opportunity to be heard. *Baltimore Law Firm*, 942 F.3d at 175–76. The Fourth Circuit also held that the magistrate judge failed to consider that fewer than one percent of the seized records were responsive to the warrant, meaning the filter team would review tens of thousands of privileged communications unrelated to the investigation. *Id.* at 172, 176. The Fourth Circuit identified the "appearance of unfairness" as an independent concern: reasonable members of the public would find it difficult to believe that filter team agents or prosecutors would ignore privileged information they reviewed. *Id.* at 182–83. Prosecutors must ensure not merely that justice is done, but that it appears to be done. *Id.* at 183. As a remedy, the Fourth Circuit directed that a magistrate judge (rather than a government filter team) perform the privilege review. *Id.* at 179–80. Magistrate judges are judicial officers and neutral arbiters with no stake in the investigation's outcome. *Id.* at 181 n.19.

*Baltimore Law Firm* has several parallels to this case and provides instructive guidance anytime the government seizes a large swath of information unrelated to its investigation and that information includes privileged material (attorney-client communications in *Baltimore Law Firm*; First Amendment and attorney-client communications here).

The government acknowledges that it established probable cause to obtain only a small fraction of the material it seized. (Feb. 20, 2026, Tr. at 28.) Allowing the government to search through the entirety of a reporter's work product—when probable cause exists for only a narrow

19

subset—would authorize an unlawful general warrant. *See Marron v. United States*, 275 U.S. 192, 196 (1927).

Moreover, the appearance problem identified in *Baltimore Law Firm* is amplified here. Given the documented reporting on government leak investigations and the government's well-chronicled efforts to stop them, allowing the government's filter team to search a reporter's work product—most of which consists of unrelated information from confidential sources—is the equivalent of leaving the government's fox in charge of the Washington Post's henhouse. *See Baltimore Law Firm*, 942 F.3d at 177 (quoting *In re Grand Jury Subpoenas*, 454 F.3d 511, 523 (6th Cir. 2006)). The concern that a filter team may err by neglect, by malice, or by honest difference of opinion is heightened where its institutional interests are so directly at odds with the press freedom values at stake. *See id.* at 178.

At the very least, "the unique facts and circumstances of this case preclude [the government's] Filter Team operating under [the government's] Filter Protocol from reviewing the fruits of this search warrant." *Id.* at 183 (Rushing, J., concurring).

The Court's approach is also consistent with the DOJ's own Statements of Policy governing information requests from news media, found in 28 C.F.R. Part 50. Those regulations require that proposed search warrants directed at the press "be narrowly drawn," 28 C.F.R. § 50.10(c)(4)(vi)–(v), that they "should not be used to obtain peripheral, nonessential, or speculative information," *id.* § 50.10(c)(4)(i)(A), and that "investigators should use search protocols designed to minimize intrusion into potentially protected materials or newsgathering activities unrelated to the investigation, including but not limited to keyword searches (for electronic searches)," *id.* § 50.10(d)(4). Permitting the government's filter team to review all of Movants' data would violate these requirements.

20

Accordingly, the Court rejects the government's request to conduct an unsupervised, wholesale search of all Movants' seized data using a government filter team. To gather the information the government needs to prosecute its criminal case without authorizing an unrestrained search and violating Movants' First Amendment and attorney-client privileges, the Court will conduct the review itself. *Baltimore Law Firm* mandates this result.

E.

No easy remedy exists here. Movants' First Amendment rights have been restrained. The government seized all of Ms. Natanson's work product, documentary material, and devices, terminating her access to the confidential sources she developed and to all the tools she needs as a working journalist. The government's proposed remedy—that she simply buy a new phone and laptop, set up new accounts, and start from scratch—is unjust and unreasonable.

But the Court takes seriously, as it must, that this case involves top secret national security information. The Court does not know where on the spectrum this information falls and whether its disclosure would "inevitably, directly, and immediately" cause harm. *New York Times Co.*, 403 U.S. at 726–27 (Brennan, J., concurring). The Court takes the government at its word, while acknowledging the well-documented concern that the government has at times overclassified information to avoid embarrassing disclosures rather than to protect genuine secrets. *See, e.g.*, COMM'N ON PROTECTING & REDUCING GOV'T SECRECY, REPORT OF THE COMMISSION ON PROTECTING AND REDUCING GOVERNMENT SECRECY, S. Doc. No. 105-2 (1997), https://perma.cc/N4J4-CBMB; Pub. Interest Declassification Bd., Transforming the Security Classification System: Report to the President (Nov. 2012), https://perma.cc/5WEU-W29N.

The Court's genuine hope is that this search was conducted—as the government contends—to gather evidence of a crime in a single case, not to collect information about

21

confidential sources from a reporter who has published articles critical of the administration. The Court further hopes the record ultimately bears out the government's representations.

## VI.

For all these reasons, the Court ORDERS as follows:

1.      The Court GRANTS the Motion to Intervene. (ECF No. 8.)

2.      The Court GRANTS in part and DENIES in part the Motion for Return of Property. The Court GRANTS the motion as to all information outside the limited information authorized by the search warrant. All non-responsive information on Movants' devices must be returned to Movants. The Court DENIES the motion with respect to the limited information authorized by the search warrant. The Court DENIES without prejudice Movants' request for the return of the seized devices. That issue is reserved for future proceedings.

3.      The portion of the search warrant authorizing the government to open, access, review, or otherwise examine any of Movants' seized data is RESCINDED.

4.      The Standstill Order (ECF No. 18) remains in effect.

5.      The Court will conduct an independent judicial review of the seized materials. The Court will develop a process for this review in consultation with counsel for the parties.

6.      A status conference is scheduled for March 4, 2026, at 2:00 p.m., in Courtroom 400.

Entered this 24th day of February 2026

_____
William B. Porter
United States Magistrate Judge

Alexandria, Virginia

22

# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
--------------------------------x
                                :
UNITED STATES OF AMERICA        : Case No.:
                                : 1:26-sw-54
                 Plaintiff,     :
        v.                      :
                                :
313 SOUTH ROYAL STREET,         : February 20, 2026
                                :
                 Defendant.     :
--------------------------------x
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE WILLIAM B. PORTER,
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

A P P E A R A N C E S

FOR THE PLAINTIFF:     GORDON D. KROMBERG
                       United States Attorney's Office
                       2100 Jamieson Avenue
                       Alexandria, VA 22314

                       CHRISTIAN DIBBLEE
                       U.S. DEPARTMENT OF JUSTICE - Civil
                       1100 L. Street N.W.
                       Washington, DC 2005

                       JOSEPH E. BORSON
                       U.S. Department of Justice
                       20 Massachusetts Avenue N.W.
                       Washington, DC 20009

FOR THE DEFENDANT:     SIMON A. LATCOVICH
(WP Company)           NICHOLAS GAMSE
                       Williams & Connolly LLP
                       680 Maine Avenue, S.W.
                       Washington, DC 20024

(Client Rep)           JOHN KENNEDY, General Counsel

FOR THE INTERESTED     DOROTHY A. JEFFRESS
PARTY:                 TRISHA ANDERSON
(Hannah Natanson)      Hecker Fink LLP
                       1050 K Street NW, Suite 1040
                       Washington, DC 20001-3743

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

2

OFFICIAL U.S. COURT REPORTER:        MS. TONIA M. HARRIS, RPR
                                     United States District Court
                                     401 Courthouse Square
                                     Tenth Floor
                                     Alexandria, VA 22314

3

**P R O C E E D I N G S**

(Court proceedings commenced at 2:00 p.m.)


THE COURTROOM CLERK:  Calling 26-sw-54.  United States versus 313 South Royal Street.

Parties, please state your name for the record.

MR. KROMBERG:  Good morning, Your Honor.  Gordon Kromberg for the United States.  With me at counsel table is Christian Dibblee and Joseph Borson from the Federal Programs Branch civil division of the Department of Justice.

Mr. Dibblee will be primarily handling the proceeding today.

THE COURT:  All right.  Good afternoon.

MR. LATCOVICH:  Good afternoon, Your Honor.  Simon Latcovich from Williams and Connolly for movant, the Washington Post.  With me are my partners, Nick Gamse, Tobin Romero, and Tom Hentoff.  From the Washington Post General Counsel -- excuse me, with me is also the Washington Post general counsel, John Kennedy.  With him from his office is James McLaughlin, Erin Gretsel (ph), and Micah Ratner.  Also the publisher of the Washington Post, James [sic] D'Onofrio, and the executive editor, Matt Murray, are in attendance as well.

THE COURT:  Welcome.  All right.  We're here today on movant's motion.  Who is going to take the lead for the

United States v. 313 South Royal St.

4

movant?

MR. LATCOVICH:  Right back up, Your Honor.

THE COURT:  I've read everyone's materials.  I appreciate them, they've been helpful in helping me prepare for today, and I'm ready to have you supplement anything you'd like.

MR. LATCOVICH:  Thank you, Your Honor.  May it please the Court.  The government here seized the newsroom. Rather than focus on specific documents regarding the investigation at issue, the government commandeered the entirety of Washington Post reporter, Hannah Natanson's, professional life.

The seizure included information regarding 1200 confidential government sources from more than 120 federal agencies.  Even worse, Your Honor, the government now seeks this Court's permission to run roughshod over the First Amendment in view of all the seized materials with not so much as a nod to the constitutional protections afforded the Press.

To clarify what's at stake today, I had plans to quote the Founders.  I was going to wax, or at least try to wax eloquently about the First Amendment, but I woke up in the middle of the night last night with the simple thought that clarified the issue for me, and it's this:  Today more than 1200 confidential government sources are following this very proceeding to learn whether or not their identities will be

United States v. 313 South Royal St.

5

exposed to government agents.  That's the issue, that's why this is an unconstitutional prior restraint, Your Honor.

The government froze Ms. Natanson's news gathering. It took away her access to sources.  And by threatening to review everything that it seized, the government has now chilled the Post sources and interfered with its publishing activities.

To limit these significant First Amendment interests, all of the seized materials should be immediately returned, or at the very least, Your Honor, the government should not be permitted to review these materials and any review should be done by counsel for the Post and Ms. Natanson.

Let's turn to the government's -- why the government's search and seizure is an impermissible prior restraint, Your Honor.  The practical effect of the seizure has been to silence a reporter.  Before the raid, Ms. Natanson was a reporter who covered the federal workplace and received dozens to hundreds of tips per day from confidential government sources on her Signal account.

Since the seizure, those sources have dried up.  She cannot contact her 1200-plus sources because their contact information and communications were housed on Signal accounts that were only accessible through her seized devices.  Now, nor can she publish the stories she was actively working on at

United States v. 313 South Royal St.

6

the time of the raid.

Furthermore, the government has chilled future news gathering and publishing activities.  The government has no answer to the assertion that its seizure and extensive review will deter future sources from contacting the Post or Ms. Natanson.  Instead, the government argues this is not a prior restraint at all because no court has actually ordered the Post or Ms. Natanson not to publish.  But that formalistic argument, Your Honor, defies reality and is contrary to the law.

As the Supreme Court said in *Stanford Daily*, A seizure that interferes with the publication or communications of ideas is a prior restraint.  That's the effect here.  The government's argument would mean there's no prior restraint if the government seized all of the Post's printing presses.  After all, under the government's theory, there will be no Court order preventing the Post from publishing a particular story the next day.  That cannot be the law.

THE COURT:  Let's just talk a little bit about the seizure.  You've talked about the seizure and the scope of the seizure, the fact that her devices were taken, her phone, and her laptop, and the like.

In this electronic age that we live in, how would you propose that a search take place in a situation such as this when all the information is on an electronic device?

It's not like the *Stanford Daily* case where they go in and they look for a couple of photographs or it may be a more traditional search.

There are some nuances here, I think, with this case that we haven't seen in perhaps any other case that I've seen, where it involves both national security, and at least in the first instance a search of electronic data, which in today's age, oftentimes has to be gathered and sifted through.

MR. LATCOVICH:  I agree, Your Honor.  And I think I would respond by saying this, there are ways of actually doing document searches on site.  It is -- it takes more time.  It probably costs more in resources, but I think a special circumstance like this might justify it.

But even then, Your Honor, it's not -- you used the word "seizure" and you used the word "search."  And I want to distinguish between the two.  It's the combination of the broad seizure, plus the refusal to return unresponsive materials, plus the --

THE COURT:  I get your argument on that, and that's something that I certainly appreciate, but we also are in a situation here where the government is in a standstill based on your filing and our decision to hold this hearing.

So I get your point, but I think the government hasn't returned it because they are -- have been ordered to hold their search and wait and see what happens today.

United States v. 313 South Royal St.

8

MR. LATCOVICH:  Well, to be clear, Your Honor, we asked for that return before the standstill order and the government refused, but I agree --

THE COURT:  I understand.  But we have to appreciate the posture we're in.

MR. LATCOVICH:  Right.  And I do think, Your Honor, it's the combination of the overbroad seizure and the government's insistence that they be able to look at everything.

THE COURT:  But back to my point, when we talk about a broad seizure, and we're talking about a seizure of the devices and the like, tell me how you would propose to do it in this day -- this electronic age with all the material residing on one laptop or two laptops or a laptop and some phones, as it is in this case?

You make much of the fact that it's been a broad search, and I get that.  There may be something to your argument that some of it should be returned.  But I just want to challenge the assumption that you're making that there were some other way to go about seizing the information and then searching for relevant information other than what happened. Other than your argument, I suspect, that you think it should have been handled by a subpoena, and we can take that as it comes.

MR. LATCOVICH:  That's my first response is a

United States v. 313 South Royal St.

9

subpoena would, of course, be the easier way of doing this. But even --

THE COURT:  But you recognize that the subpoena process is not always the right way to go.  There are some agencies that may have existed here, it having to do with national security.  And also, at least in my view as the judge who executed the search warrant, that there was some imminent concern that evidence would be destroyed.

Now, you've challenged that, and you think maybe that there was -- either it was too late or there would have been plenty of time, whatever the case may be, that's the judgment I made, and we're here today, and we're talking about it, but I still haven't heard some other way that you think this should have been handled, other than the subpoena.

MR. LATCOVICH:  Well, Your Honor, I think the other way that it could be handled is, one, the seizure itself addresses those preservation concerns and those national security interests that you described, and period, full stop.

THE COURT:  Once the information has been seized and preserved.

MR. LATCOVICH:  Well, unfortunately, it's all of Ms. Natanson's materials --

THE COURT:  I understand.

MR. LATCOVICH:  -- that have been seized and preserved.  I think to me, the question going forward then is,

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

United States v. 313 South Royal St.

10

how do we identify the material that might be responsive to the search warrant in a way that protects all the relevant equities.

THE COURT:  I think that's a much more productive discussion.

MR. LATCOVICH:  That is not a quibble with the seizure, it's how do we go forward from the seizure.  And that's where, frankly, we hope to focus all of our arguments today, Your Honor.

THE COURT:  All right.

MR. LATCOVICH:  So, Your Honor, I take it then we don't need to focus on the prior restraint arguments right now?

THE COURT:  I certainly understand the arguments.

MR. LATCOVICH:  Okay.  All right.  Understood.

Then, Your Honor, let's turn to the 41(g), which is kind of my shorthand for how we think this thing should go forward.

So, if Your Honor is disinclined to order the immediate return of all of the materials, it should order the return of the nonresponsive materials.

THE COURT:  Let me ask you this, are you aware of any instance where material has been returned in a -- I'll use the term "civilian" -- has been allowed to search the realm of information for national security information?

MR. LATCOVICH:  Well, Your Honor, I mean, that can't be the standard for the First Amendment, because otherwise the Pentagon Papers case would have come out different.  There the government sought to enjoin the Washington Post and the New York Times from publishing its articles, and its argument was you're going to publish classified information.  And the Court said, No, the First Amendment trumps, that's a prior restraint.

So I understand the idea that classified information is important, protecting it is certainly a valid government interest, but it's not case determinative.  Otherwise, the Pentagon Papers would have come out the other way.

THE COURT:  All right.  Any other example?

MR. LATCOVICH:  Well, Your Honor, I've certainly had multiple criminal cases in which there has been classified information, and we have worked with the Department of Justice's Litigation Security Group to manage the defense counsel review of those classified information.

THE COURT:  Sure, that happens all the time.

MR. LATCOVICH:  Right.  So, in that situation it's not directly -- it's not directly responsive to what you said, Your Honor, but there have been processes that I have been a part of where it is counsel for the aggrieved party that is reviewing classified information, yes.

THE COURT:  All right.

United States v. 313 South Royal St.

12

MR. LATCOVICH:  But the issue, Your Honor, is that here, at the very least, only counsel for the Post and Ms. Natanson should review the documents.  And I think what's clear about this, Your Honor, as we've been discussing, I don't think there's any dispute, though, most of these -- a great majority of the information here is not actually responsive to the warrant.

And so, the question then is how to return, going to where you started, Your Honor, how to return these unresponsive materials.  The touchstone for this is reasonableness.  And as the Supreme Court has acknowledged, what's reasonable in one setting may not be reasonable in another setting.  Just like Your Honor said, there are unique facts and circumstances here.

THE COURT:  I agree with that.

MR. LATCOVICH:  And so, I do think it is important to consider the background of reasonableness and the background settings here.

One, the government has abandoned decades of policy and practice in executing a search report -- a search warrant, rather, on a reporter's home in connection with a national security leak investigation.  I mean, how different would the world have looked had the government executed a search warrant on the house of a young Bob Woodward or, go back to the Pentagon Papers, sought to execute a search warrant on the

United States v. 313 South Royal St.

13

Washington Post and the New York Times for the Pentagon Papers.

Also, consider the current environment, Your Honor. This is the same executive branch that's evicted from the Pentagon all reporters who would not agree to publish only what the government permitted them to do so. There is a pattern here, Your Honor, that this is part of.

But reasonableness also takes into account the particular facts here. I think going to what you said, if the government had been able to seize a particular file folder called "Perez-Lugones," certainly the balancing test would be very different, Your Honor, we would be making different arguments. But, they seized terabytes of data.

And, again, our focus is how do we move forward by protecting the First Amendment privileges that apply to that data, the PPA privileges that apply to that data, and the attorney-client privilege issues that apply to that data.

And the government's reaction, Your Honor, is -- well, I want to say this, the government has an issue of holding on to that property. They have an issue, Your Honor. In cases like the Supreme Court case in *Heller* and the *State v. J-R Distributors* case in Washington, all of those cases hold that the -- if the government lawfully seizes pornographic materials, it can't keep them, absent a prompt determination from the Court, that those materials were

United States v. 313 South Royal St.

14

obscene and, therefore, not protected by the First Amendment.

Here, we have a massive amount of data that's undisputed that's protected by the First Amendment, and yet, the government thinks that it can keep all of these. And it just can't be that pornographers have more protection than the Press under the First Amendment.

So the government's response here is don't worry about any of this, we've got a filter team. The filter team cures these issues. Your Honor, the rest of the world refers to a government filter team as the government. Those 1200 sources, doesn't matter whether its agents in the front of the courtroom or in the back of the courtroom who are looking at these communications, it's still the government. And regardless of whether you call them a filter team or something else, it's all the same government.

James Madison didn't include the filter team exception to the First Amendment and the Court has -- excuse me, the government has cited no precedent to adopt one now.

So, I think, Your Honor, the government does have interests. We acknowledge those. One is preservation of evidence, and two is classified information. I think the preservation of evidence, Your Honor, is easily accommodated by the government keeping -- I mean a freeze order, for example, accommodates that. Or even if the government -- if the Court orders the return of property under Rule 41(g), the

United States v. 313 South Royal St.

15

Court can condition that return of property on preservation of all of the documents, et cetera.  So I think that is a --

THE COURT:  What about just the return of the data versus the return of the devices?  I mean it strikes me, and I don't want to get too far ahead of us, but it strikes me that there may be easy ways to look for information that clearly is irrelevant, whether it be date searches or some other way, and the data comes back versus the devices in the first instance.

The government cites some cases which, again, I think we're ahead of ourselves, that suggest that there may be something about devices and an inability to wipe information from it that may create some problem.

Now, those cases are not -- I should say technology changes rapidly, and we don't know what this situation may be. And, again, I think we're getting ahead of ourselves.

But just responding to your point about the return of the devices versus the return of the data, do you draw any distinction there?

MR. LATCOVICH:  I think often in the case, Your Honor, the answer to that is "no."  I think the data is data. I do think there is a unique circumstance here that makes a difference and that is the Signal account.  I think absent access to the phone itself, that Signal data cannot be accessed.

But I also think these are details that could be

United States v. 313 South Royal St.

16

worked out as part of a process.  I agree that perhaps I'm getting a little ahead of myself, but I think that is one big qualifier under the question about data versus devices.

And, again, that's not to say there might not be a way to accommodate that working with the DOJ's Litigation Security Group in a way that would allow us to pull even that data.

And, Your Honor, I want to talk, since you brought up classified information, I think one big red herring here is that the government thinks that we are trying to decide what's classified or not or asking you to do so, and that's just not correct.  That is not --

THE COURT:  It is certainly not a classification issue.  If the government says it's classified, it's classified, and there's nothing the rest of us can do about it.  I took their argument mostly to be maybe they are the best at determining what information is classified information and how it's located on the various devices.

MR. LATCOVICH:  Yeah, certainly I think they have the expertise in classification, Your Honor.  I don't think they have the expertise on locating the information on the devices, particularly given that these are Washington Post's devices and the devices belong to Ms. Natanson.  I think, if anything, we have the expertise there and could more quickly find potentially responsive materials.

United States v. 313 South Royal St.

17

Again, Your Honor, I would say that the classification issues can be addressed by working with the DOJ's litigation support group.  This is not an issue.  I think the classification issue allows the government to dictate kind of the terms of the review and where that review takes place, but I don't think that it should be able -- it should be permitted to dictate the identity of the reviewers, given the privileged information that exists here.

So you've got those government interests, Your Honor.  And I think in terms of balancing those interests, we're not riding on -- we're living in unprecedented times, but we're not riding on a blank slate here.  We have the Fourth Circuit's case in the *In re Warrant Issued June 13th, 2019*, that specifically held that privileged determinations are a judicial function.  Not to be held -- not to be made by a government filter team as they propose.

Again, I think the Fourth Circuit also reversed the finding that the filter team was appropriate.  Again, what the government requested.  We also see this in the *House Rayburn* [sic] case -- *Office Building* case as well, Your Honor.  Again, to protect the constitutional privileges there, the D.C. Circuit rejected a filter team.

THE COURT:  I recognize both of those cases, and I think that there is some daylight between those cases and this one only based on the information involved, right, because in

both of those cases, the review that was proposed to have been handled by the defendant in the *Rayburn House* case, or whatever it was, and the *Baltimore Law Firm* case had to do with privileged information that the attorneys and their clients had the right to access versus the government's position here that the movants have no right to look at classified national information -- classified defense information.  It's a distinction, I think, is my point.

MR. LATCOVICH:  I think there is -- I think you can try to draw a distinction there, Your Honor.  I think it's a distinction without a difference.  I think the government has created --

THE COURT:  I think there's a difference between looking at your own material and looking at someone else's material, especially when that other material is National Defense Information that may bear a top secret classification. There's got to be a distinction there.

MR. LATCOVICH:  Well, Your Honor, I think there is a distinction in the sense that you need a security clearance to review that information, of course, but that's a logistical burden, not a burden of impossibility, right.  So I don't think -- what I don't think, Your Honor, is even if that is true for the limited number of documents that may exist as you describe, I don't think that justifies the government's intrusion into the massive number of other privileged

United States v. 313 South Royal St.

19

documents.

THE COURT:  I don't disagree with that, and I think there's also a third option that's raised in *Baltimore Law Firm,* which is another way to go, which is that the Court does it.

MR. LATCOVICH:  We agree, Your Honor.  I mean, certainly I think a Court review is more protective than having government agents -- sorry, Christian, I'm pointing at you -- having government agents look at the documents.  I do think -- we do think there is a slight chilling effect from the Court looking at this.  I think confidential government sources probably still think of the Court as part of the government itself, and Ms. Natanson even had Court sources amongst her many, many government sources.

But we recognize that it is a spectrum, and I do think that that is a different analysis were the Court to look at these as opposed to government agents.

Your Honor, I guess the last thing I would say then is that we do feel pretty strongly this case is, as you say, there are very unique circumstances here.  It's not about one reporter or one newsroom, it's about the confidential government sources here.  And those confidential government sources have produced some of the most consequential investigative journalism cases in our country's history from Watergate to the Pentagon Papers.

United States v. 313 South Royal St.

20

And if the government and its agents can review a reporter's entire professional career on the basis of seeking information about a single individual, it's going to burn a thousand sources and censor their untold stories.  And it's going to chill disclosures going forward and lead to self censorship of both confidential sources and reporters alike.

Your Honor, that's why we would respectfully request that the Court either return all of the information or ensure the return of nonresponsive material in a process supervised by the Court.

THE COURT:  Thank you, Mr. Latcovich.

MR. LATCOVICH:  Thank you, Your Honor.

THE COURT:  Mr. Dibblee.

MR. LATCOVICH:  Well, Your Honor, before -- I think counsel for Ms. Natanson, who is here, Ms. Jeffress, I think, has a few things to say as well.

MS. JEFFRESS:  Thank you.  Thank you, Your Honor. Amy Jeffress on behalf of Ms. Natanson, and I am with Trisha Anderson, my partner.

Your Honor, the government obtained a search warrant in this case in connection with its prosecution of Mr. Perez-Lugones.  But the government's search and the seizures and proposed review of her personal and professional devices violates the privacy of my client, Hannah Natanson, who has suffered significant harm both personally and

United States v. 313 South Royal St.

21

professionally as a result of the government's actions.

So just briefly, it's 6 o'clock in the morning, a team of FBI agents came to her door with the warrant, forbid her from moving freely within her own home, and seized personal property in addition to Washington Post's property, including her iPhone with thousands of personal photographs, her running watch, her charger, items that really have nothing legitimately to do with the prosecution of Mr. Perez-Lugones.

In the shock of this unprecedented search, it's had lasting consequences.  Most seriously, she's been unable to continue with her reporting.  Because of the loss of her Signal, she has gone from receiving hundreds of messages a day to almost none.

As far as we are aware, Your Honor, the government has never before searched the home of a reporter based solely on the reporter's news gathering activities.  And I think Mr. Latcovich's example of the Bob Woodward example is a good one.

THE COURT:  Much has been made of that, I recognize that, but I want to just point out two things.  One is that in the article she wrote about a process, she talked about the fact that she worked from home.  And the other piece is they found the material relating to the search warrant at her home.

So I think that it's an inflammatory fact.  I certainly get that a search warrant directed at anyone at any

time, no matter where they are, is probably a difficult time, but it just happened to be the case that she worked from home and her material was there.

MS. JEFFRESS:  That is correct, Your Honor.  But I think a lot of people work from home now in our post-Covid world, and I don't think this situation is really that much different, Your Honor, from a lot of leaked cases that the government could be investigating.

I do want to talk a bit about my prior service at the Department of Justice.  The Department of Justice has had a long-standing practice of avoiding just this kind of activity, not searching a reporter's home, but exhausting all other avenues to obtain information relevant to a national security prosecution.

And there have been hundreds of leaked cases in the national security division's history, and in none of those did the Department decide to search a reporter's home, even though I'm sure there are other cases where there was probable cause to believe that a reporter's devices possessed at home might contain national security information.

So they've done something here that opens the door to a lot of reporters' homes being searched without a very good reason.  I don't see much difference, and certainly the government can speak to this, but I don't see much difference between this case and many, many others that I've seen in my

United States v. 313 South Royal St.

23

experience.

But just to go back to the reasons for the long-standing practice, under which the Department of Justice did not search reporters' homes, is that the Department of Justice has recognized that they need to respect the free press and to have a careful balance of First Amendment and national security interests.

And so, throughout my tenure at the Department of Justice, the government was committed to the reasonableness of the First Amendment and to reasonably accommodating First Amendment interests in its handling of leaked cases.

So, Your Honor, you were asking earlier for examples of situations where there has been a review of devices that have been seized by civilians, and there -- it's hard to come up with circumstances similar to this case because this has never been done before. And so, I understand why you're asking those questions. I just think it's difficult for us to come up --

THE COURT: It's also difficult, at least, on changing technology. And I'm not aware, at least, maybe you are, but I'm not aware of another case where the alleged method of communication of this material happened over a piece of technology, an application that was designed to almost immediately destroy the evidence. That's a relevant fact.

MS. JEFFRESS: I do appreciate that, Your Honor, but

United States v. 313 South Royal St.

24

it happens all the time.  And that is -- it is a fact, it is a fact of modern technology, but I think Signal has been used now for, I don't know exactly how many years, but nine, ten years perhaps, and that -- this is still an unprecedented move on the Justice Department's part to try to obtain Signal.

I will also say that as we -- Your Honor, you were asking what are the alternatives for getting the government the information it needs.  The situation that we have now is that while there was a subpoena to the Washington Post, that the Washington Post would reasonably process in order to provide the information that the government seeks.  That subpoena's return date was at the end of last month and that has now past because of this litigation, because the government chose to issue a subpoena and also to search Ms. Natanson's home and prompt this litigation.

It's in the government's papers that Ms. Natanson's phone, iPhone was on lockdown, and so that iPhone is on lockdown, whatever disappearing messages are not going to be accessible given that fact, perhaps never.  And so, I'm not sure that they are in a better position having done this search than they would have been if they had relied on the Post to provide the information they sought via subpoena.

Just to go back, Your Honor, to the questions that you were asking -- that you were asking Mr. Latcovich relating to the proposal of, you know, his and the Post reviewing the

United States v. 313 South Royal St.

25

information on the devices, I have been involved, both as a DOJ attorney and in private practice, in many cases in which defense counsel and even third-party counsel have been required to review and safeguard national security information.

I've had a clearance.  In my 20 years at the Department of Justice, I had a security clearance.  I've had it since 1994.  I have had it reactivated in private practice. And so, I've had it for a very long time unbroken.  And in any private practice, I have had access to national security information, including Top Secret/SCI and very highly compartmented information, which is not even at issue in this case.

But in my prior experience as defense counsel, I have worked very closely with the Department of Justice, with FBI agents, with the Litigation Security Group, to facilitate the government's legitimate need and access to classified information that my clients have in certain situations had access to.

To echo the point that Mr. Latcovich made about the DOJ Litigation Security Group, they are very responsible and have significant experience working with attorneys, with agents, with defense counsel, with the Court, to facilitate the secure handling of national security information.

So based on my experience, I believe that they would

United States v. 313 South Royal St.

26

be more than capable of assisting the Court and our team and the government in the review that would be required to meet the government's legitimate needs in this case.

So for all of those reasons, we would request that the devices be returned to the Post and to Ms. Natanson so that we, along with Post counsel, working with the government counsel, can provide them with the information, legitimately sought, for the purposes of the Perez-Lugones matter without compromising the Post and Ms. Natanson's reporting or the Nation's need for robust First Amendment.

And, Your Honor, I do fear that if that doesn't happen in this case that the government will, following its change to the media guidelines policy, perhaps start searching reporters' homes on a regular basis in leaked cases.  It's always been the case, in investigating leaked cases, that the easiest way to get access to the information about who is leaking information to the news media, is to go to the news media and request that information or search for it.

But the government has been very cautious, in deference to the First Amendment in the past, to go first to the group of government employees who are the ones who had legitimate access to classified information.  And the government would go and try to find everyone who had access to the information and figure out who it was who leaked that information.  And to their credit, that's exactly what they

United States v. 313 South Royal St.

27

did in this case.

They found some classified information in reporting, they figured out who had access to it, they focused very quickly on Mr. Perez-Lugones, and they arrested him and they -- they did that before ever searching Ms. Natanson's home.  And then, without access to any of the information from Ms. Natanson's home, they have now obtained an indictment.

I'm not sure what basis, and one can speak to this perhaps, I'm not sure what basis they have to obtain additional information from Ms. Natanson's home in connection with that prosecution.

But I do understand, having been in their shoes, that they would want to know everything that they can get their hands on that Mr. Perez-Lugones would have had.  And if some of that is in the Post's devices and Ms. Natanson's devices, there are other ways of obtaining that than executing a search warrant at her personal home.

Thank you, Your Honor.

THE COURT:  Thank you, Ms. Jeffress.

MR. DIBBLEE:  Good afternoon, Judge Porter.  As mentioned earlier, Christian Dibblee on behalf of the United States of America.

I woke up in the middle of the night too last night with a very bad voice, so I apologize already for how I sound. I'm just going to get through it as best we can.

United States v. 313 South Royal St.

28

THE COURT:  No brilliant thoughts though?

MR. DIBBLEE:  Not at that hour, Your Honor.  I don't have Mr. Latcovich's clairvoyance in the early morning hours.

Your Honor, movants here seek return of property now even though the government has probable cause to believe that property contains evidence of a serious crime.  Namely, the transmission of classified information to someone who was unauthorized to access it.  And we can seek that all before the government has been able to review the property for that evidence.

As we say in our brief, the Courts around the country, and even the advisory committee's notes to Rule 41, acknowledge that this kind of motion should be denied when the United States has a need for seized property in an investigation of prosecution.  And, I think it's --

THE COURT:  Well, what's the government's need for all of the information?  You must concede here that the scope of information that the government is likely to find, if it is allowed to search through this material, is going to be infinitesimally small compared to the amount of data that was taken.

MR. DIBBLEE:  I'm happy to concede, Judge, that there is more information that has been seized than is responsive to the warrant.  I would say, though, that is precisely why we had put in place the filter team to ensure

that only information that is responsive to the warrant gets to investigators.  That is a common practice.

I understand what the movants say about filter teams, and I understand Mr. Latcovich's point that they are still made up of government agents.  But it is nonetheless common and frequent for the government to engage in filter teams to ensure that investigators do not have access to privileged information or information that is otherwise protected.

I also would say, Judge, in multiple cases that we cite in our briefs, the Fourth Circuit has acknowledged that when the government is doing a search of a computer, information that is related to the criminal wrongdoing, it's not always labeled as such.  And the government --

THE COURT:  Certainly the case, right.  I mean, the child porn cases are the typical ones that we see all the time where a defendant, as it would be in usually those types of cases, has misnamed or changed the name to make it hard to find.  I would like to think that there are still search parameters that could be done that could figure out -- in this case in particular, because, you know, in say, like, a child pornography case, you're looking for a certain type of information.

In this case, the government is only authorized, at best, to look for information within a very narrow window of

United States v. 313 South Royal St.

30

time.  And notwithstanding that, Ms. Natanson has been deprived of basically her life's work.

MR. DIBBLEE:  So I have a couple of responses if you will allow.  The first of which is the filter protocol that we have outlined in our brief does talk about using key words to ensure that filter agents who would be investigating or, excuse me, would be looking at these materials, would be doing their very level best to identify only information that is responsive to the warrant.

THE COURT:  I will tell you that the protocol that you outlined in your brief I find to be exceptionally vague.

MR. DIBBLEE:  I understand that, Judge.  I'd be happy to tell you that we are willing to file the full protocol under seal after this hearing, if you would like.  We did not do so for a variety of sort of administrative bureaucratic reasons that were occasioned by the rushed nature of this proceeding in getting ducks in a row.

THE COURT:  Did I give you extra time?

MR. DIBBLEE:  You certainly did, Judge.  As I hope you can understand, there are several people above me in the chain and that kind of thing and, you know, we need to get the appropriate sign-offs.  But we have those now, and we're happy to submit the filter protocol in its entirety to you on the docket under seal, if that's something that you would appreciate seeing, if that would help.

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

I can't remember where I was.  I think you had -- you had mentioned about the government's need to look at -- or that there was more information that the government has seized than it has an interest in.  You know, I do think that the filter team is designed to ensure that investigating agents do not receive more than they are -- than they absolutely need to deal with the crime that the government has probable cause to believe evidence of is on that computer.

THE COURT:  Well, I mean just if you look at the *Baltimore Law Firm* case, right, and I think that that is probably the -- at least, as far as I understand, the top case in the country that relates to filter teams in this type of a scenario.  And I think it's not unfair to say that the Fourth Circuit has been probably the most skeptical of all the other circuits of how to use the filter teams.

And one of the things that they raise in the *Baltimore Law Firm* case is, among a number of other things, including the scope of the information gathered versus what they are likely to obtain, but also the faith in the process.

And the movants make a decent point about the faith in the process here when it's beyond dispute that the government has been looking for leaks for a long period of time, and they go after a reporter in a unique way, in a way that they really haven't done before.  It's not that crazy to think that public confidence might be lost if the government

gets to look at the same information that is protected.

MR. DIBBLEE:  Well, I would say in response that the Fourth Circuit case also raises some facts that we talk about in our brief that I think very seriously undermine the public confidence there.  Namely, the same U.S. Attorney's Office that had seized the evidence and had the filter team, was investigating other clients of that law firm.  Meaning, I think in that circumstance --

THE COURT:  Well, that could potentially be the case here.  Now, maybe your protocol would be different, but it's not inconceivable to believe that if the filter team is looking through this material and the plain view doctrine is in place, that some of the attorneys who are looking at this material also find evidence of other types of crime, and then they believe that they are -- they may become involved in that as well.

MR. DIBBLEE:  Your Honor, that is true, and plain view exception, under Fourth Circuit law, would allow the government to at least seek another warrant for material that is -- that is viewed during the course of that review.

THE COURT:  Is the government willing to waive the plain view doctrine in this case?

MR. DIBBLEE:  Your Honor, I'm sorry, I'm not authorized to do that right now, so no.  But I will just point out that, as I said -- and, again, we are happy to submit the

United States v. 313 South Royal St.

33

full protocol in its entirety to you, and it sounds like maybe we should do that regardless.

The government -- the filter protocol intends to ensure that the government really is trying to keep this review hued, as narrow as possible, to attach it to the warrant that you signed.

I think the government understands and takes seriously that you did not authorize a fishing expedition, notwithstanding, the Fourth Circuit precedent that is out there that does allow for at least a cursory review of every file on the computer.  The government does take that seriously.

THE COURT:  While we're talking about taking things seriously, let me just, if I could, detour for just a moment and talk about the Privacy Protection Act.

MR. DIBBLEE:  Sure.

THE COURT:  Why was that not included in the application?

MR. DIBBLEE:  Your Honor --

THE COURT:  Did you not know about it or did you decide not to tell me?

MR. DIBBLEE:  Your Honor, with respect, I was not involved in the search --

THE COURT:  You're at the podium.

MR. DIBBLEE:  And I understand that, but I do -- I

United States v. 313 South Royal St.

34

do not know the answer to your question.

THE COURT:  Well, as I read your regulations in the Department of Justice manual, as well as in the regulations, approval for this warrant had to go all the way up to the Attorney General.  That strikes me to believe that countless, maybe not countless, but a number of lawyers had the opportunity to look at that affidavit before it was submitted to me.

I also rejected it a number of times, and I had multiple conversations with counsel for the government over the course of two days about this warrant because I was concerned about it, and not one time did anyone from the government raise the issue.

Did you do it because you didn't know or you just decided not to tell me?

MR. DIBBLEE:  Your Honor, I would --

THE COURT:  What is the government's response?

(Mr. Kromberg stands.)

THE COURT:  Sit down.

MR. DIBBLEE:  Your Honor, the government's response is that the PPA is not adverse authority in this case for all the reasons that we --

THE COURT:  Not adverse authority?  Do you think it is relevant authority?

MR. DIBBLEE:  So I do think it is relevant, but I

United States v. 313 South Royal St.

35

also, again --

THE COURT:  Do you think you have an obligation -- do you think the government has an obligation to disclose relevant authority to a magistrate judge who is making the determination of probable cause on a search warrant?

MR. DIBBLEE:  Your Honor, again, respectfully and with pleading some forgiveness on your part, I am not involved in how search warrants get done or get submitted --

THE COURT:  Well, I would have liked to have thought that the government would have sent someone to the podium to discuss that issue.

MR. DIBBLEE:  I certainly understand your frustration, Judge Porter.

THE COURT:  That's minimizing it.

MR. DIBBLEE:  Well, forgive me.  I do not intend to minimize it.  I think what I -- what we have said, though, and what I -- you know, I continue to say is that the PPA is, obviously, a statute that the government does -- is aware of.

THE COURT:  The Department of Justice regulations require you to get approval.  The regulations say that you have to file the PPA Act.  They're all embedded in one another.  How could you miss it?  How could you think it doesn't apply?

MR. DIBBLEE:  Excuse me, Your Honor.  You mean it doesn't apply to this particular --

36

THE COURT:  Yes.

MR. DIBBLEE:  -- particular search?  We have said in our papers why the PPA did not bar this particular search.

THE COURT:  That's a different question.  It very well may be that you're right.  It very well may be that if you had identified it and I had reviewed it, I would have come to the same conclusion.

My question is, why didn't you raise it?  You don't think you have an obligation to do that?

MR. DIBBLEE:  Your Honor, forgive me.  I'm not qualified to say whether the Department has an obligation or not.

THE COURT:  Well, that is convenient.

MR. DIBBLEE:  If I was qualified, I certainly would answer your question.

THE COURT:  It's convenient that you're here not qualified to answer a, what I think, is a threshold question in this case.  Go ahead, continue with your argument.

MR. DIBBLEE:  Forgive me.  I forget where I left off on this.  I think we were talking about the Fourth Circuit case in the --

THE COURT:  Tell me whatever you want me to know.

MR. DIBBLEE:  Well, I think the key thing that I just -- that I do want to note is what we say in our brief, which is that the filter team in that case did involve certain

United States v. 313 South Royal St.

37

facts that are not present here.  There are -- you've already raised the presence of classified information as being an important, I believe you said, daylight between that case and this case, and that is one reason why we think a filter team is extremely important, and that it's important that the government be the one, through its filter agents, to identify and locate the classified information, which is the government's property, and is information in which the government has a constitutional and a unique interest in.

I would also like to address something that comes up in the movant's reply brief and came up here during Ms. Jeffress's presentation, which is that -- this discussion about how the movant's counsel should be the ones to do a first review because they have security clearances that are relevant to this information that -- I believe they say they have TS/SCI clearances.

With respect to their former service, it is not just a clearance that allows someone to access classified information.  What is required is not just a clearance, you have to sign an NDA.  You also need to have a need-to-know the information.  And a need-to-know is defined by the relevant executive order as a determination made within the executive branch that the prospective recipient must have access to that information.

And as we have -- as we say in our papers, and as

38

multiple courts have said over time, just because there are civil counsel are involved in the case that might raise classified information, does not mean that they then have a need-to-know all classified information that is the subject of that case. And this is -- this is part of *Sterling v. Tenet*, 416 F.3d 338, from the Fourth Circuit. *Tilden v. Tenet*, 140 F.Supp.2d 623, out of this district in 2000.

There have also been multiple statements by the Fourth Circuit and the D.C. Circuit, which have made clear that just because a lawyer is particularly trustworthy or is viewed as possibly being trustworthy, that does not mean that the risk of disclosure of national security information is not also -- is not still present.

I'm happy to give you those. The main case from the D.C. Circuit is *Ellsburg v. Mitchell*, 709 F.2d 51, from 1983. And then the Fourth Circuit case on this is a case called *Alfred A Knopf, Inc. v. Colby*, 509 F.2d 1362, Fourth Circuit 1975.

So, again, I'm not trying to be disrespectful of the prior service of opposing counsel or of their trustworthiness. But courts before this one have acknowledged that when classified information is -- excuse me, that disclosure of classified information to even one person without a need-to-know does create a risk of disclosure. It could be inadvertent, even in a good faith effort, it would be done by

United States v. 313 South Royal St.

39

movant's counsel to review -- to review the information, that risk is still there.  And for that reason, we don't think that they should be the ones to take a first crack at that review.

THE COURT:  All right.

MR. DIBBLEE:  If you don't mind if I check my notes real quick.

THE COURT:  Yes.

MR. DIBBLEE:  All right.  I have nothing further for Your Honor.

THE COURT:  All right.  Mr. Kromberg, did you want to be heard?  You can come to the podium if you would.  I didn't mean to be intemperate with you, but you might sense that I'm a little frustrated by --

MR. KROMBERG:  Yes, sir.

THE COURT:  -- how our process went down.

MR. KROMBERG:  Yes, sir.  As Your Honor knows, I was the AUSA who was on that warrant.

THE COURT:  Did you not tell me intentionally or did you not know?

MR. KROMBERG:  I knew.

THE COURT:  Why didn't you tell me?

MR. KROMBERG:  Because I had been involved in multiple search warrants just like this in the past -- I shouldn't say just like this.  But, in the *WikiLeaks* case, we got multiple search warrants and we had multiple memos from

United States v. 313 South Royal St.

40

the Department of Justice discussing the PPA, and we were advised between 2013 and 2020 that the PPA did not apply when there was a reason to believe that the individual who maintained the information was involved in the offense.

And in this case, paragraph --

THE COURT:  Isn't that an issue for the Court to analyze and at least know about so it can consider it in evaluating a search warrant or do you think it's best to leave it out?

MR. KROMBERG:  First --

THE COURT:  I mean, doesn't that get you closer to the conclusion you're looking for?

MR. KROMBERG:  Yes.  However, Judge, I would note that not only that, but the PPA memos that we've done in the past, say that instrumentality --

THE COURT:  I'm not so interested in those.

Do you disagree with me that it's relevant information to the inquiry?

MR. KROMBERG:  Yes, I disagree --

THE COURT:  That's the end of the inquiry?

MR. KROMBERG:  May I finish, please?  I don't think it's appropriate for us to discuss what laws don't apply under certain facts.

THE COURT:  I find it hard to believe that in any way that this law did not apply.

United States v. 313 South Royal St.

41

MR. KROMBERG:  Then I apologize to you, because I should have told you that if -- but, again, I do not think that we put in the laws that don't apply when we search for warrants.

THE COURT:  I just -- I just can't understand how you could have reached that conclusion when the policy manual, the regulations, and the statute themselves speak to these types of issues.  I just --

MR. KROMBERG:  They do.  And the Department of Justice had said that they don't apply in this particular setting, and I have the memos on that from a case when we searched for the email, excuse me, for the computer --

THE COURT:  How about something from a Court that said they don't apply versus something from the Department of Justice as the outcome --

MR. KROMBERG:  In fact, Judge Ellis, Judge, Judge Ellis wrote, when he -- when a woman, who was a photojournalist, sued because she was being searched in *Senate v. United States*, Judge Ellis ruled that it didn't apply.  And the search warrant was -- did not say -- the affidavit in support of the search warrant did not say that the PPA doesn't apply, it didn't say anything about the PPA.  And when Senate sued, Judge Ellis ruled that the facts in the search warrant was sufficient to show probable cause that the suspect exception applied and, therefore, the suit was dismissed.

United States v. 313 South Royal St.

42

THE COURT:  All right.

MR. KROMBERG:  And that case was -- was affirmed in the Fourth Circuit, and in the Fourth Circuit the Fourth Circuit repeatedly cited the case, I believe from the Sixth Circuit, which said that in these circumstances the filter team is the way that you make sure --

THE COURT:  I'm not looking for additional argument on that.  My question was very simple to you, and I understand your response.  Thank you.

MR. KROMBERG:  Thank you.

MR. LATCOVICH:  Your Honor, may I very briefly?

THE COURT:  Yes, please.

MR. LATCOVICH:  Your Honor, first, on the search protocol, we've been shooting at a moving target from the day of this raid.  Every time we talk to a government agent, it is, well, these are decisions being made above me.  We got no clarity.  In fact, before we filed, sought this Court's intervention, we got no clarity whatsoever on a review protocol.  They refused to commit to any protocol.

We see one in the papers that we don't quite understand other than it doesn't provide any protection for the First Amendment, and now we understand that there's apparently another protocol.  I don't know what that is, so I'm not sure what else there is to say to that.

On the issue of filter teams, Your Honor, I think

United States v. 313 South Royal St.

43

you made most of my arguments better than I could, so I'm not going to dwell on that.  I will say this, to the extent there was a discussion about plain view, I think that was a driving force in the Fourth Circuit's opinion.  And I do think it cuts against, given the privileged nature of the other documents here, I do think it cuts against the use of a filter team.

On access to classified information, Your Honor, I think the government provides clearances to counsel in cases all the time, and I don't think this case is any different.  I think the idea, frankly, that an inadvertent disclosure is the best excuse they can have for not providing clearances in this case to somebody who's had a TS/SCI clearance like me, multiple members of our team have had TS/SCI clearances, both Ms. Natanson's counsels, sitting at counsel table, have had TS/SCI clearances.  The idea that the best the government can muster is inadvertent disclosure, I think, tells a lot.

Finally, Your Honor, I was paying attention, and it sounds like the Court is inclined to do the review himself. And if so, my only request would be that counsel for the Washington Post and Ms. Natanson be able to review any potential responsive documents that you determine are potential responsive for privilege before they are turned over to the government.

I think that was the protocol in the *In re Search Warrant* issued June 13, 2019, approved by the Fourth Circuit.

United States v. 313 South Royal St.

44

That was the same process in the D.C. Circuit formulated in the *House Rayburn Building.* So we would just like the opportunity to assert privilege. Obviously, Your Honor would be the one who would ultimately decide those privileges.

THE COURT: All right.

MR. LATCOVICH: Thank you.

THE COURT: Thank you. Ms. Jeffress, did you wish to be heard again?

MS. JEFFRESS: Nothing further from us, Your Honor. Thank you.

THE COURT: All right. Well, thank you all for your arguments and your written papers.

I have a pretty good sense of what I'm going to do here, but I thought about giving you my decision today, but I want to think a little bit more about some of the things that I heard from you today and get something to you quickly.

I do think that we're going to need a follow-up get-together somewhat soon to start on the process, whatever it may be. I was going to propose Thursday.

Is counsel available?

MR. LATCOVICH: Yes, Your Honor.

THE COURT: All right.

MR. DIBBLEE: Your Honor, I apologize. I am arguing a case in Massachusetts on Thursday. I will not be back until Friday around 11:00 a.m. I fly into Reagan, so I can come here

after I land if you'd like.

THE COURT:  No, I can't -- well, I'm sorry, you arrive when?

MR. DIBBLEE:  Friday.  I come back from Boston on Friday.

THE COURT:  Oh, you come back.  Not Thursday.  Okay. I'm just trying to move this along, because I understand the issues here.  I'm not available on Friday or Monday.  If we push into the following week, I have to look at my calendar.

Tuesday morning?  I'm sorry, that's the 3rd, March 3rd.  I can do the morning, not the afternoon. 10:00 a.m.?

(Mr. Dibblee nods head.)

THE COURT:  All right.  We'll plan to get together on March 10th at 10:00 a.m. -- excuse me, March 3rd at 10:00 a.m.  You should have something from me before then and I hope that we can --

MR. LATCOVICH:  Your Honor, I believe I'm in the DDC in the morning on March 3rd.  Is it possible to do the afternoon?

THE COURT:  No, I can't do the afternoon.  I have something scheduled already.  I can do the afternoon on the 4th.

MR. LATCOVICH:  Yes, Your Honor.

MR. DIBBLEE:  Yes, Your Honor.

United States v. 313 South Royal St.

46

THE COURT:  March 4th at 2:00 p.m.  All right.

MR. GAMSE:  I'm sorry, Your Honor, what time was that?

THE COURT:  2:00 p.m.

All right.  Again, thank you all, and I look forward to seeing you March 4th.

**(Proceedings adjourned at 2:54 p.m.)**

CERTIFICATE OF REPORTER


I, Tonia Harris, an Official Court Reporter for the Eastern District of Virginia, do hereby certify that I reported by machine shorthand, in my official capacity, the proceedings had and testimony adduced upon the Motion hearing in the case of the **UNITED STATES OF AMERICA versus 313 SOUTH ROYAL STREET**, Case No.: 1:26-sw-54, in said court on the 20th day of February, 2026.

I further certify that the foregoing 47 pages constitute the official transcript of said proceedings, as taken from my machine shorthand notes, my computer realtime display, together with the backup tape recording of said proceedings to the best of my ability.

In witness whereof, I have hereto subscribed my name, this February 22, 2026.



_____
Tonia M. Harris, RPR
Official Court Reporter

47